UNITED STATES BANKRUPTCY COURT      Not For Publication
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                           :     Chapter 11
                              :
BARNEY MAC, LLC,            :     Case No. 04-17768 (AJG)
                              :
              Debtor.       :
--------------------------------------------------------x


**OPINION GRANTING REQUEST FOR ADMINISTRATIVE EXPENSES**


**APPEARANCES:**

LEVY & BOONSHOFT, P.C.
Counsel for Lowell Associates

477 Madison Avenue
New York, New York 10022
(212) 751-1414

      David M. Levy, Esq.
        Of Counsel


BACKENROTH FRANKEL & KRINSKY, LLP
Counsel for Debtor

489 Fifth Avenue
New York, New York 11023
(212) 593-1100

      Mark Frankel, Esq.
        Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

Before the Court is the motion (the "Motion") for an order pursuant to 11 U.S.C.

§ 503 directing the debtor-in-possession, Barney Mac, LLC, (the "Debtor")[1] to pay the

movant, Lowell Associates ("Lowell" or the "Movant"), all administrative expenses in

the form of additional rent for the commercial space which the Debtor occupies and from

which the Debtor operates its business.  The issues before the Court are (i) whether the

tax escalation clause, under the rider to the subject lease agreement, is enforceable under

New York law, and, if so, (ii) whether the tax escalation clause is enforceable after the

property at issue is converted to a condominium with a commercial unit and a residential

unit where the ownership of the units is not held by the same entity.

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On December 8, 2004, the Debtor filed a petition for reorganization under

Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United

States Bankruptcy Court for the Southern District of New York.  The Debtor has

continued in the possession of its property and the management of its business as a

debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[1] The Court notes that term the "Debtor" refers to the Barney Mac both pre and postpetition.

No trustee or examiner has been appointed herein, nor has an official creditors'
committee been appointed in this case.

The Debtor, as tenant, operates a restaurant under the name "Boxer's" at 186
West 4th Street, New York, New York, pursuant to a lease agreement (the "Lease") with
Lowell, as landlord.  The Debtor acquired the Lease in July 2000 for $495,000 through a
sale before the Court in the Chapter 7 case of Blood, Sweat & Beers, Inc. ("BSB").
Michael Hayes, the Chief Executive Officer and managing member of the Debtor, was
also a co-owner of BSB and an active principal of BSB that was personally involved in
its operation and management.[2]

The Debtor asserts that the Lease was extended pursuant to an extension
agreement (the "Lease Extension").  Lowell claims, among other things, that the Lease
Extension is a forgery.  The Debtor denies that allegation.  Lowell commenced an action
in state court in proceedings entitled Lowell Associates v. Barney Mac, LLC, pending in
the Civil Court of New York County (the "State Court Litigation") to resolve the dispute
related to the Lease Extension.

On December 28, 2004, Lowell filed a motion to lift the section 362 automatic
stay, and thereafter, on January 13, 2005, Lowell and the Debtor stipulated that the stay
would be lifted to allow the State Court Litigation to proceed.  As part of the same
stipulation that allowed the State Court Litigation to proceed, the stipulation extended the
time for the Debtor to assume or reject the Lease and the Debtor agreed to make monthly
rental payments of $19,000 to Lowell each month pending a final determination of the
State Court Litigation.

---

[2] See Docket # 38: Affidavit of Marjorie Otter.  The Debtor does not dispute the assertions made regarding
the role of Michael Hayes in the Debtor or BSB.

Lowell prevailed in the State Court Litigation.  The Debtor has since filed an appeal of the state court's ruling.  Thereafter, the state court entered an order providing for a stay pending appeal so long as the Debtor paid Lowell monthly rent.

The time to assume or reject the Lease has since been extended, on consent of the parties, by the Court.  On April 24, 2006, the Court issued its most recent order that extended the Debtor's time to assume or reject the Lease.  The order granted an extension of time

> … not to exceed sixty days (60) from the earlier of (a) the date on which Debtor is served with a final determination in the state court litigation with respect to [Lowell's] non-monetary claims under the Lease; or (b) the Debtor no longer has a stay pending appeal of the [d]etermination…. In all other respects the terms of the Initial Stipulation shall remain in full force and effect.

Regarding the background of the Lease, Lowell is the owner of certain real property and improvements located at 9 Barrow Street, New York, New York a/k/a 186 West 4th Street (the building and the real property which is situated is hereafter referred to as the "Real Property").  The Real Property was used for commercial and residential purposes, and was taxed as a single lot by the New York City Department of Finance.  On August 16, 1988, Lowell filed with New York State a Declaration Establishing a Plan for Condominium Ownership (the "Declaration").  On October 14, 1988, Lowell entered into the Lease with BSB commencing on February 1, 1989, for the store and basement (the "Leased Space") at the Real Property, which has an entrance on 186 West 4th Street, New York, New York.

The Leased Space is one of six storefront units that comprise the Commercial Unit.  The main floor of the Leased Space is 52' by 48', or 2,496 square feet.  The main floor of the Commercial Unit measures, in its entirety, 6,657 square feet.  Accordingly,

4

the Leased Space amounts to approximately 37-1/2% of the main floor of the

Commercial Unit on a square footage basis.[3]

Pursuant to the Declaration dated August 16, 1988, which was recorded in the

Office of the Register of the City of New York, County of New York, in Reel 1016, the

Real Property was converted to condominium ownership (the "Condominium").  The

conversion to condominium ownership was effective as of the date of the filling on

August 16, 1988.  The declarant/sponsor was Lowell, the fee owner of the Real Property.

The Declaration provided for a condominium consisting of two units: a commercial unit

(the "Commercial Unit") comprised primarily of certain store units including the space

leased to the Debtor; and a residential unit (the "Residential Unit") consisting primarily

of the residential apartments.  As a result of the conversion, the existing single tax lot

was divided into Lot 1101, the Commercial Unit, and Lot 1102, the Residential Unit.[4]

At the time of the conversion, Lowell remained the owner of both units.

As stated previously, the Lease became effective on February 1, 1989.  On

February 23, 1989, Lowell transferred ownership of the Residential Unit of the

Condominium to 9 Barrow Owners Corp.  Thus, the Lease became effective after the

date of the conversion to condominium ownership but prior to the sale of the Residential

Unit.[5]

Subsequent to the conveyance, the Residential Unit was converted into

cooperative ownership (the "CO-OP") by 9 Barrow Owners Corp. pursuant to a

---

[3] See Docket # 55: Affidavit submitted by Lowell on September 18, 2006
[4] See Docket # 41: Lowell Associates' Reply Brief in Further Support of its motion for an Order Directing Payment of Post-Petition Administrative Expenses
[5] See Docket # 55: Affidavit submitted by Lowell on September 18, 2006

Cooperative Offering Plan, which was filed with the Department of the State of New York.[6] Lowell remains the owner of the Commercial Unit.[7]

It is acknowledged by both parties that Lowell, as the landlord, is owed additional rent in the form of real estate tax escalations, which should be awarded as administrative expenses. However, the Debtor disputes the amount due.

The clause at issue in the instant matter is the tax escalation clause (the "Tax Escalation Clause") that was included in a rider agreement (the "Rider") to the Lease that was agreed to at the time the Lease was entered into on October 14, 1988. Paragraph 43 of the Rider provides detailed terms that define how tax escalations are to be determined, how the tenant's portion is to be calculated and paid, and the extent to which certain events are intended to impact the calculation of the tenant's portion as additional rent. Specifically, subparagraphs 43(a)(i) and (ii) make clear that the tenant's portion of the "taxes" are to be calculated based upon "the total amount of real estate taxes levied, assessed, or imposed against" the land and the entire building situated thereon, defined collectively as the "Real Property." Drawing from the definitions in subparagraph 43(a), subparagraph (b) and (c) address the computation of tax escalation and impose upon the tenant an obligation to pay additional rent in a sum equal to 33-1/3% of any such increase from that of the "Base Tax Year." The "Base Tax Year" is defined in subparagraph 43(a)(iv) as "the Tax Year commencing July 1, 1988 and ending June 30, 1989."

---

[6] See Docket # 54: Affidavit submitted by Lowell on August 10, 2006. Neither the affidavit nor other material submitted provides the date the Cooperative Offering Plan was filed. However, the specific date of that filing is not relevant for the Court's analysis.
[7] See Docket # 54: Affidavit submitted by Lowell on August 10, 2006

Subparagraph 43(d) is the tax refund clause (the "Tax Refund Clause") of the

Rider.  The Tax Refund clause provides that in circumstances where the landlord has

received a tax refund, the tenant is to receive its proportionate amount, less certain

expenses, of the refund based on the amount of taxes it has overpaid.  Subparagraph

43(d) reads as follows

> If the Landlord shall receive any tax refund in respect of any Tax Year with
> respect to which Tenant shall have paid any monies pursuant to this numbered
> Article, the Landlord may retain, out of such refund, any reasonable expense
> incurred by it in obtaining such tax refund, the Landlord shall pay to the Tenant,
> provided Tenant is not then in default in payment of rent or additional rent under
> this lease with respect to which Landlord shall have given notice 33-1/3% of such
> remaining balance of such tax refund; otherwise such sum shall be paid to tenant
> if and when the default is cured.  If landlord shall obtain a reduction in assessed
> valuation in respect to which Tenant shall have paid any monies pursuant to this
> numbered Article, the amount of taxes for such Tax Year plus amounts of any
> reasonable expense incurred by landlord in obtaining such reduction shall be
> deemed to be the taxes finally determined to be payable by Landlord for such Tax
> Year.

Additionally, subparagraphs 43(c), (d) and (f) define specific circumstances under

which the tenant's 33-1/3% of tax escalation obligation may be subject to adjustment.

Subparagraph 43(c) provides for circumstances involving a tax protest.  Specifically,

subparagraph 43(f) an extraordinary increase in taxes as a result of the sale, ground lease,

or alteration of the Real Property.  Subparagraph 43(e), as explained below, addresses

the situation where the Real Property is converted to condominium and/or cooperative

ownership.

Subparagraph 43(e) provides for the continued obligation of the tenant to pay

increased rent based on the Tax Escalation Clause even if the building was converted to a

cooperative ownership and/or condominium and such resulted in units being owned by

different entities.  Subparagraph 43(e) reads as follows

7

In the event the building of which the demised premises forms a part is, in the future converted to cooperative ownership and/or condominiums, one of which will include the commercial areas of the said building, the foregoing relevant provision of Par. 43 shall be used in the aggregate, for computation of whether the owner named herein is the owner of all or any of the condominium units making up the building herein above references to the real property.

Following the conversion and partition of the Real Property, the Commercial Unit and the Residential Unit each received a separate tax bill. Prior to that period, apparently one tax bill was received which included the tax for the Real Property as a single tax. In accordance with its interpretation of paragraph 43, Lowell calculated any increase of the taxes based on the tax for the Real Property by taking the sum of the two tax bills and charging the tenant 33-1/3% of the total amount of tax increase over that of the Base Tax Year. Lowell delivered two statements to the tenant every year for the tax year commencing July 1. In accordance with subparagraph 43(b), the Lease required additional rent to be paid both in advance and in semi-annual installments, July 1 and January 1. However, it does not appear that the tenant was ever provided with a copy of any of the actual tax bills from the City of New York that broke down the taxes owed on each lot, although neither does it appear that the tenant ever requested any such tax bill.[8]

Since the inception of the Lease and the subsequent sale of the Residential Unit in February 1989 Lowell billed the tenant for additional rent pursuant to paragraph 43. That time period includes the time after BSB filed for bankruptcy protection in March of

---

[8] The Commercial Unit's assessed market value of the assessed value of the Real Property has varied since the conversion to condominium ownership. In the tax year 1988-89, the Commercial Unit was assessed at $898,800 and the Residential Unit was assessed at $3,301,200, for a total assessed value of $4,200,000. At that time the Commercial Unit represented 21.4% of the total assessed value of the Real Property. (See Docket #39: Affidavit of Robert M. Pollack, Esq.). The Commercial Unit's proportionate share of the assessed value of the Real Property has increased over time. According to the "Annual Real Estate Tax Bill for 2004-05," the assessed market value of the Commercial Unit was $1,886,868 and the Residential Unit was $3,631,820. The total assessed value for the Real Property was $5,518,688. The Commercial Unit's assessed value is 34% of the assessed value of the Real Property. (This percentage is computed based upon information provided in Docket #38: Affidavit of Marjorie Otter, Exhibit B).

2000 and the time following the assignment of the Lease to the Debtor.  During that

period, the tenant, whether BSB or the Debtor, paid the additional rent to Lowell without

objection and without ever challenging Lowell's interpretation or the validity and

enforceability of the Tax Escalation Clause.  As stated previously, during that entire

period, Michael Hayes was an active principal of BSB and personally involved in its

operation and management.  After thirteen years of the Debtor paying the tax bill in

accordance with Lowell's interpretation of paragraph 43, the Debtor, in late 2002,

stopped paying the tax escalation amounts and advised Lowell for the first time that it

was not responsible for 33-1/3% of the aggregate tax bill of the Real Property, minus the

Base Tax Year, because the Real Property had been converted to the Condominium.

Thereafter, as stated previously, the Debtor filed a petition for reorganization on

December 8, 2004.

On March 15, 2005, the United States Trustee filed a motion to convert this

Chapter 11 case to a Chapter 7 case or, in the alternative, to dismiss it.  The motion was

based upon the alleged deficiencies in the Debtor's obligations as a debtor-in-possession,

specifically the Debtor's obligation to file monthly operating reports.

On May 16, 2005, the Debtor filed its objection to the motion by the United States

Trustee to convert or dismiss the case.

On September 12, 2005, Lowell filed the Motion.  It sought the payment of

administrative expenses from the Debtor for the Leased Space.  The Motion also sought,

as an alternative, the granting of the United States Trustee's application to convert this

case to a Chapter 7 case or to dismiss it in its entirety.  On consent, the Court adjourned

the motion by the United States Trustee.  The United States Trustee eventually withdrew

her motion because the issues, which mainly concerned the Debtor's monthly operating statements, were resolved.

On October 10, 2005, the Debtor filed its objection to the Motion for an order compelling payment of real estate taxes and other charges under section 365(d)(3) of the Bankruptcy Code. The Debtor stated, among other things, that (a) it is current in its obligations to Lowell pursuant to the stipulation approved by the Court, (b) the Debtor consents to the relief sought to the extent that Lowell seeks compensation for the Debtor's share of the real estate tax escalations attributable to the space occupied by the Debtor, (c) in addition to the real estate tax escalations attributable to the Debtor's space, Lowell seeks to have the Debtor pay a portion of the real estate tax escalations attributable to the CO-OP[9] to whom Lowell sold the Residential Unit of the Real Property, and (d) the weight of authority holds that a tenant is only responsible for its share of those real estate tax escalations actually paid by the landlord on account of the property leased by the tenant, unless the lease is unmistakably clear, and thus, since the Rider in this case is ambiguous as to any obligation the Debtor might have to pay additional real estate tax escalation amounts not attributable to its space, the Debtor should only pay its share of the real estate escalations due for its space.

On December 9, 2005, Lowell submitted its reply brief in support of the Motion. Lowell argued that the lease expressly provides for the payment of additional rent in the form of tax escalations, the parties to the lease expressly contemplated a conversion to condominium and/or cooperative ownership and agreed in advance how to calculate the tenant's additional rent, and that Lowell and the Debtor, along with the Debtor's

---

[9] The Court notes that during the course of these proceedings the parties at times referred to the condominium by the term CO-OP.

predecessor-in-interest, interpreted the provisions in subparagraph 43(a) through (f) as they were written. Lowell argued that the Lease and the Rider were not ambiguous, which was made evident by the course of performance between the parties. Specifically, Lowell noted that the tenant of the Real Property had been making the rental payment for years and the language of the Tax Escalation Clause in the Lease is clear and unambiguous, and the Rider agreement is not susceptible to more than one reasonable interpretation. Additionally, Lowell argues, that since it was the intention of the parties to be bound by the clear terms of the Rider and that upholding the Rider does not violate any public policy, the Rider and its Tax Escalation Clause should be upheld.

A hearing was held on December 14, 2005. At that hearing, Lowell, as it had in its reply brief, asserted that the plain language of the Rider should control. Further, Lowell noted that subparagraph 43(e) deals directly with the current circumstances of the tenant being liable despite the partition and conversion of the Real Property resulted in different parties owning the condominium units of the Real Property. Lowell argued that the Rider was not ambiguous because no reasonable alternative meaning is offered as to what the agreement would mean.

Furthermore, Lowell argued that the best evidentiary practice in the state and federal courts to clarify the intent of the parties was to consider how the parties have preformed under the contract in the course of its performance. Lowell asserted that subsequent to the agreement for a thirteen-year period, from 1989-2002, the tenant paid its allocable share of the rent increases on both the Residential Unit and the Commercial Unit, in accordance with the Tax Escalation Clause in paragraph 43. Lowell also argued that this conduct was consistent with the early actions by the parties and the partitioning

11

of the Real Property came as no surprise to the Debtor. Specifically, Lowell noted that months before the lease was signed, the building was being setup for conversion into a condominium and/or CO-OP and a signed declaration with the State of New York to this effect had already been filed. Similarly, Lowell asserted that three weeks after the Lease was signed, the Real Property was converted into two tax lots, one residential and the other commercial.[10]

To further illustrate the long history of the established meaning of the Rider, Lowell also noted that Michael Hayes, who is currently the managing member of the Debtor, was also a principal in the original tenant (BSB) under the Lease and in both instances, the rental payments that were made by the tenant included the tax escalations allocation, calculated in accordance with paragraph 43, that was based upon the increase to both the residential lot and the commercial lot.

Lowell also addressed the Debtor's objection that it did not receive a copy of an official tax bill from the City of New York attributable to the Real Property until this litigation began. Lowell asserted that if the Debtor, or its predecessor in interest, had desired a copy of a tax bill they had thirteen years to request one. Further, Lowell asserted that had a request for a copy of the tax bill been made, Lowell would have complied.

In responding to a question of the Court as to how to "read" the Tax Refund Clause with the balance of the agreement, Lowell noted that the issue has never taken shape, but if it did, and the CO-OP received a refund, then it would pay the tenant its

---

[10] Based upon the Affidavit(s) submitted by Lowell on August 10, 2006 and September 18, 2006 (Docket Number(s), 54 and 55), this statement is inaccurate. The conversion of the Real Property into two condominium units, each as a separate tax lot, occurred on August 16, 1988. The Lease was effective on February 1, 1989. The Residential Unit was sold on February 23, 1989.

proportionate share.  However, Lowell conceded that the language dealing with the tax

refund could have defined it more specifically by providing language that would have

reflected the current circumstances.

Additionally, Lowell asserted that it was not against public policy in New York

for the rent to be based on certain markers, regardless of the actual cost to landlord,

where the parties agree to such terms.  The essential consideration Lowell argued is

whether the parties unmistakably intended to form the agreement.  Looking at plain

language of the contract, and the subsequent actions by the parties, it is clear that the

parties contemplated subparagraph 43(e) would make the tenant responsible for 33-1/3%

of the tax escalation of both the Residential Unit and Commercial Unit, regardless of

whether the landlord of the Leased Space owned the entire parcel (the Real Property).

In responding to a question from the Court, Lowell stated that although the CO-

OP is paying the tax on the Residential Unit, it was proper that the Debtor's rent include

the tax escalations under the allocation formula regarding the Real Property because the

taxes are just a base figure used as a marker to determine the tenant's rent.

The Debtor offered a different interpretation.  The Debtor noted that this payment

scheme was not a measurement of rent, or a marker, but it was rather a vehicle designed

with the intent to make the tenant responsible for 33-1/3% of taxes on the whole building

or, if the building is partitioned, only 33-1/3% of taxes of that portion of the Real

Property that the landlord of the Commercial Unit actually owns.  The Debtor argued,

among other interpretations, that the language in the Rider should be read so that the

owner of the Real Property should receive 33-1/3% of the tax escalation for the Real

Property only in situations where there was a single owner of the Residential Unit and

Commercial Unit.  The Debtor also argued, as previously referenced, that it should not pay any taxes not attributable to its (the Debtor's) space.

Further, the Debtor argued that it would not be in keeping with the public policy of the State of New York to hold a tenant responsible for tax increases on property not owned by its landlord, unless the lease is unmistakably clear regarding that obligation. Further, the Debtor argues that since the lease is ambiguous under New York law, the Debtor should not be forced to pay taxes for any other portion of the Real Property other than the Commercial Unit.  The Debtor pointed to certain language in the Rider that it alleges would make the entire lease agreement ambiguous.  Specifically, the Debtor noted the inconsistency of the Tax Refund Clause where the landlord was receiving from the tenant payments for property taxes when the landlord was not the actual owner of the Residential Unit and the Commercial Unit.  Thus, the landlord would not be obligated to pass along any portion of the tax refund that it did not receive because it did not pay all of the taxes related to both units.

The Debtor also addressed the course of performance issue raised by Lowell.  The Debtor noted that although it may have overpaid for years, that does not mean it should be forced to continue to overpay.  Further, the Debtor alluded to the fact that some of the overpayment may be attributable to not having received an official tax bill.  The Debtor argued that since the tax bill was only first received by the Debtor (tenant) as part of Lowell's response to this matter, had the tenant received the tax bill in the past, it (the tax bill) would have highlighted the fact that the tenant was being billed for tax increases on property no longer owned by the landlord.

On June 5, 2006, Lowell wrote the Court, following up on two prior letters it had written the Court and a telephone call to Chambers to inquire as to the status of the instant matter. Lowell was informed that the matter was still under consideration. Thereafter, the Court scheduled a status conference.

On June 21, 2006, the Court held a status conference on this matter, since there appeared to be some confusion in the record as to whether the Real Property was a condominium or a CO-OP. The Court inquired, among other things, as to the type of ownership structure of the Real Property. The Court was informed that the Real Property was a CO-OP. The Court informed the parties of its intention to issue a ruling on the matter within 30 days. Further, the Court noted that upon its review of the instant matter, it appears that there may be latent ambiguities in some of the Rider clauses that may have arisen as a result of the partitioning of the property. The Court also noted the importance of considering the parties' conduct in having carried out this agreement. The Debtor requested an opportunity to raise additional issues regarding the course of performance between the two parties. The Court denied that request.

On August 9, 2006, the Court held another status conference. The Court sought clarification regarding the ownership structure of the Real Property. The Court requested that Lowell submit an affidavit that defined the ownership structure of the Real Property and Commercial Unit. Specifically, the Court wanted to know what, if any, part of the Real Property was a condominium, and what, if any, part of the property was a CO-OP. The Court directed the Debtor to submit a reply if it found the affidavit on the ownership structure of the Real Property to be inaccurate.

On August 10, 2006, Lowell submitted an affidavit, with regard to the ownership structure of the Real Property, in accordance with the Court's instructions.  Thereafter, on September 5, 2006, at the Court's request another status conference was held by telephone to request further clarification of the ownership structure of the Real Property and the current apportionment of the Leased Space within the Commercial Unit, because the Court found that these issues were not fully addressed in the affidavit submitted by Lowell on August 10, 2006.  The Court directed Lowell to submit an additional affidavit that fully clarified the ownership structure of the Real Property and certain dates relating to the ownership structure of the Real Property.  The Court again directed the Debtor to submit a reply if it found the affidavit to be inaccurate.

On September 18, 2006, Lowell submitted the additional affidavit requested by the Court.  The Debtor did not file any response to any of the supplemental affidavits provided by Lowell.

There is no dispute that New York State law applies to the instant matter.

### III. DISCUSSION

**The Tax Escalation Clause**

Where parties, after an arms-length negotiation, have forged an agreement, courts are generally reluctant to interfere with the intent of the parties as it is memorialized in their agreement.  "Once a contract is made, only in unusual circumstances will a court relieve the parties of the duty of abiding by it."  *George Backer Management Corp. v. Acme Quilting Co., Inc.,* 46 N.Y.2d 211, 218 (1978).

The clause at issue to the Rider in the instant case is the Tax Escalation Clause.  Escalation clauses in contracts that fix the price of future rent increases are commonly

16

used in lease agreements and are based on various markers and formulas.  One of those markers or formulas is often the future tax liability of the property that the lease is based upon.  "[A tax escalation clause] is one variant of the common commercial lease provision requiring a tenant to pay a negotiated portion of the landlord's obligation for tax increases."  *Rich v. Don-Ron Trousers Corp.,* 74 Misc.2d 259, 261 (N.Y.City Civ.Ct. 1973).  The result of an escalation clause can at times produce results that appear biased in one party's favor.  "Although the result of this construction of the escalation clause is economically harsh, parties are free to make their own contracts, and courts do not serve as business arbiters between parties in approximately equal stances."  *CBS, Inc. v. P.A. Bldg. Co.,* 200 A.D.2d 527 (1st Dep't 1994), citing *George Backer Mgmt. Corp.,* 46 N.Y.2d at 218-219.

Some New York courts, specifically the First Appellate Division, First Department, have dealt with the issue of a landlord seeking to charge a tenant additional rent for real estate taxes (i.e. tax escalation clause) on property the landlord is not obligated to pay the real estate taxes.  Earlier case law from the First Appellate Division, First Department appeared to impose a prohibition on this type of escalation clause.  *Rudd v. 176 West 87th Street Owners Corp.,* 724 N.Y.S.2d 299, (1st Dep't 2001); *S.B.S. Assocs. v. Weissman-Heller, Inc.,* 190 A.D.2d 529 (1st Dep't 1993); *Fairfax Co. v. Whelan Drug Co., Inc.*, 481 N.Y.S.2d 366 (1st Dep't 1984).  However, the recent case law from that department apparently has moved away from any strict prohibition and allows the payment of taxes by a tenant based upon a tax escalation clause, even though the landlord is not required to make the payment, where the tax escalation clause evidences "an unequivocal intent that tenant's additional rent obligation for real estate

taxes is to include real estate taxes that are not actually paid by landlord." *1152 First Ave. LLC v. MNY Holdings Associates, LLC*, 2004 WL 2482636, *1 (1st Dep't 2004), citing *Wellington Tower Associates, L.P. v. New York First Ave., CVS, Inc.*, 3 A.D. 3d 460 (1st Dep't 2004).

*Black's Law Dictionary* defines "unequivocal" as "unambiguous; clear; free from uncertainty." *Black's Law Dictionary* (8th ed. 2004). *Gilbert Law Dictionary* defines "intent" as "….[i]n documents (e.g. wills), intention is the meaning gathered from the words therein." *Gilbert Law Summaries Law Dictionary* (1997). Therefore, a finding that an agreement evidences an "unequivocal intent" will be determined where the agreement is found to be unambiguous.

The First Appellate Division, First Department's concern appears to be that a tax escalation clause, when it is intended to provide relief to a landlord, does not become an opportunity for the landlord to reap a "windfall profit" by having the tenant provide relief on taxes, that are not owed by the landlord. *Rudd,* 724 N.Y.S.2d at 299; *S.B.S. Assocs.,* 190 A.D.2d at 529; *Fairfax Co.*, 481 N.Y.S.2d at 366; *1152 First Ave. LLC v. MNY Holdings Associates, LLC*, 2004 WL 2482636 at 1; *Wellington Tower Associates, L.P. v. New York First Ave., CVS, Inc.*, 3 A.D. 3d at 460.

The department's concern appears centered around a windfall to the landlord if the tenant is obligated to include as part of its rental payments the costs of certain taxes, which are not an actual obligation of the landlord. In each of the cases cited, the obligation of a landlord to pay the taxes owed on its property was central to the court's finding that the tax escalation clause in dispute was not a "marker," but a simply pass through provision.

18

Further, each of these cases appears to involve the tax obligation on the leased premises and whether such amounts can be passed through to the tenant in situations where the landlord is no longer obligated to pay the tax, or a portion thereof, on such premises. The tax escalation provision would simply pass through the landlord's obligation on the premises to the tenant. In sum, these cases involve instances where the tax escalation clauses were a form of tax relief to the landlord, and not meant purely as a marker for future rent increases.

In *Meyers Parking System, Inc. v. 475 Park Ave. So. Co.,* 186 A.D.2d 92, (1st Dep't 1992), the department upheld a tax escalation clause where it found the language of the lease to be clear and unambiguous as to tenant's obligations. The court found that "[t]he language of the lease clearly and unambiguously specified that plaintiff was to pay 'a sum equal to 15%' of any real estate tax increase as additional rent." *Meyers Parking System, Inc.,* 186 A.D.2d at 92.

Similarly, in *Fair Oak, LLC v. Greenpoint Financial Corp.,* 810 N.Y.S. 2d 504, 506 (2nd Dep't 2006), the Second Appellate Division, Second Department, found that when dealing with a real estate tax escalation clause, where the landlord saw its taxes reduced and the tenant sought a proportional reduction in its tax burden, the court held the parties to the plain meaning of the agreement, which provided that the tenants taxes were based on clear and unambiguously defined terms within the lease that did not allow for future modification of the tenant's tax burden. *Fair Oak, LLC,* 810 N.Y.S. 2d at 505-506.

In the present case, the Rider unambiguously provides for the allocation of 33-1/3% of the tax increases on the Real Property, over the Base Tax Year, to be apportioned

to the tenant of the Leased Space.  Further, and equally as clear, the Rider provides that the tenant's obligation would continue to be 33-1/3% of the tax escalations, over that of the Base Tax Year, attributable to the Real Property, despite a partitioning of the Real Property through condominium ownership.  The Rider also provides in subparagraph 43(e), that the tenant is responsible under the Tax Escalations Clause regardless of separate ownership of the Residential Unit and Commercial Unit.  The current ownership structure was contemplated and, in fact, provided for in subparagraph 43(e).  Thus, like the lease in *Meyers,* the Rider clearly and unambiguously sets forth the Debtor's obligations.  Under the Rider the tenant is obligated to pay the 33-1/3% of the tax increase even if the landlord is not the owner of both units of the Real Property and, hence, not obligated to pay the taxes on both units of the Real Property.

Regarding the 33-1/3% provided for in the Tax Escalation Clause, there is simply no correlation between the amount of the tax increases that would become the obligation of the tenant and the amount of tax increases that would be attributable to the Leased Space on a square footage basis or an assessed value basis.  The following chart, and discussion thereof, supports that conclusion.[11]  The Court notes that from the inception of the Lease the tenant was burdened with a tax increase obligation that always exceeded any allowable share of such increase that would be based upon a ratio of the Leased Space to the Real Property.

---

[11] Sources: Docket # 55 Affidavit submitted by Lowell; Docket #38:  Affidavit of Marjorie Otter, Exhibit B; Docket #39: Affidavit of Robert M. Pollack, Esq.

| | Assessment Year | Assessed Value | Percent allocation of Lot Assessed Value to Real Property Assessed Value | Approx. Sq. Ft. of the Main-Floor of the Commercial Unit | Leased Space - Main-Floor of the Commercial Unit (Sq. Ft.) | Percentage of Leased Space/ Sq. Ft. (The Main-Floor of the Commercial Unit) |
|---|---|---|---|---|---|---|
| | | | | | | |
| Real Property | 1988-89 | $4,200,000 | 100% | | | |
| Commercial Unit (Lot 1101) | 1988-89 | $898,800 | 21-2/5%[12] | | | |
| Residential Unit (Lot 1102) | 1988-89 | $3,301,200 | 78-3/5% | | | |
| | | | | | | |
| Commercial Unit (Main-Floor Leased Space) | 1989-89 | $336,000 ($4,200,000 x 8%) | 8% (37-1/2% x 21-2/5%) | 6,657 | 2,496 | 37-1/2% |
| Commercial Unit (Main-Floor Leased Space) | 2004-05 | $706,392 ($5,518,688 x 12-4/5%) | 12-4/5% (37-1/2% x 34-1/5%) | 6,657 | 2,496 | 37-1/2% |
| | | | | | | |

As referenced above, an examination of the assessed value of the Real Property for the tax year of the conversion reveals that the Commercial Unit's assessed value of $898,800 is approximately 21-2/5% of the Real Property's assessed value. The Leased Space comprises approximately 37-1/2 % of the main floor of the Commercial Unit.[13]

---

[12] As indicated later in the chart, the 2004-05 tax year the Commercial Unit represented approximately 34% of the assessed value of the Real Property (34%= Real Property Assessed Value for 2004-05/Commercial Unit Assessed Value for 2004-05 or $1,886,868/$5,518,688).

[13] The September 18, 2006 Affidavit (Docket #55) computes the percentage of Leased Space of the Main Floor of the Commercial Unit as 37-1/2%. The Main Floor is measured at 6,657 sq. ft. The entire Commercial Unit as reflected in attachment to the affidavit and is measured at 14,766 sq. ft., which includes the cellar and likely the allocation of the common space. The Court assumes that, under any analysis, the main floor containing the store units would account for substantially all of the assessed value of the Commercial Unit. However, regardless of how the cellar and common space are accounted for in the percentage of Leased Space to the Commercial Unit, the conclusion that the tenant agreed to be obligated

Applying that percentage (37-1/2%) to the percentage of assessed value of the Real

Property attributable to the Commercial Unit immediately after the conversion (21-

2/5%), the result is that the Leased Space accounted for approximately 8% of the

assessed value of the Real Property.  Under the Rider, the tenant agreed to be responsible

for 33-1/3% of the tax escalations, over that of the Base Tax Year.

The Court finds that the aforementioned supports the conclusion, as stated above,

that there is no correlation between the tenant's liability for tax increases and the amount

of tax increases that would be allocable to Leased Space based upon an assessed value

analysis.  Although, over the years, the assessed value of the Commercial Unit increased

at a greater rate than the assessed value of the Residential Unit, nevertheless, even when

by the 2004-05 tax year the assessed value of the Commercial Unit represented

approximately 34% of the assessed value of the Real Property, the Leased Space (of the

main floor) would still only account for approximately 12-4/5% of the assessed value of

the Real Property.  The lack of correlation between the actual allocable assessed value

and the tax increase obligation under the Rider reflects the parties' intention to burden the

Leased Space with a greater allocation of any tax increases than would be allocated to the

Leased Space from a purely economic standpoint.  Further, at the inception of the lease

term and for a number of years thereafter, the tax increase obligation of the tenant (33-

1/3%) exceeded the tax increase obligation attributable to the entire Commercial Unit.

The Court notes, as stated above, that it was only recently that the Commercial Unit's

assessed value was approximately equal to the 33-1/3% rate provided for under the Tax

Escalation Clause.

---

for tax escalations far in excess of any allocable percentage than would be attributed to the Leased Space
would not change.

Although the aforementioned is not determinative of the issue before the Court as to whether the Lease unambiguously imposed the 33-1/3% tax increase regardless of the separate ownership of the Residential Unit and the Commercial Unit, it does demonstrate that the tenant agreed to be burdened with taxes far in excess of what would have been attributed to the Leased Space. Such agreement is not indicative of a "pass through" tax escalation clause where the landlords passes through the tax attributable to the particular leased space, but is indicative of a "marker" upon which future rent increases are based.

The Court also considers such analysis relevant when considering certain policy issues meant to prevent unjust enrichment. In the instant case, the tenant agreed to assume a greater allocation of the tax increase obligation, regardless of whether the condominium units where held by one party or two parties, than would be allocated to the Leased Space from a purely economic standpoint. Nevertheless, no policy concerns are implicated where the parties to an agreement, as the Rider reflects, freely exercised their rights to shift certain economic burdens.

Regarding the Debtor's interpretation of the Rider, it appears that the Debtor has advanced four interpretations. One interpretation is that the Debtor is only required to pay taxes attributable to the Leased Space. However, based upon the chart above, and the corresponding discussion, at no time was there any correlation between the 33-1/3% tax obligation and the tax obligation actually attributable to the Leased Space. The tenant's tax obligation under the Lease always exceeded the amount attributable to the Leased Space based upon an allocation of assessed value or square footage.

A second interpretation advanced by the Debtor is that the tenant is only responsible for its share of those real estate tax escalations actually paid by the landlord

on account of the property leased by the tenant. The Debtor makes this statement in light

of the fact that the Rider *expressly* provides that the tenant should pay 33-1/3% of any

increase at a time when the Leased Space represented 8% of the assessed value of the

Real Property.

    The Debtor also argues that it should only have to pay for those taxes that are

attributable to the Commercial Unit. However, this ignores the fact that at the inception

of the Lease and for many years thereafter the actual tax increase on the Commercial Unit

was significantly less than the 33-1/3% allocation under the Lease.

    Further, the Debtor also asserts that the language in the Rider should be read so

that the owner of the Real Property should receive 33-1/3% of the tax escalation for the

Real Property only in situations where there was a single owner of the Residential Unit

and Commercial Unit. However, the express terms of the Rider are inconsistent with

that interpretation. Specifically, subparagraph 43(e) provides for the continued

obligation of the tenant to pay increased rent based on the Tax Escalation Clause even if

the building was converted to a cooperative ownership and/or condominium and such

resulted in units being owned by different entities.

    Finally, the Court notes that according to Lowell, the basis of the Debtor's

original assertion to Lowell that it was not responsible for 33-1/3% of any tax increase

was that the Real Property had been converted to the condominium ownership.[14]

However, the conversion to condominium ownership was expressly provided for in the

Rider and actually took place prior to the effective date of the Lease.

---

[14] See Docket # 41: Lowell Associates Reply Brief in Further Support of its Motion for an Order Directing
Payment of Postpetition Administrative Expenses. The Debtor has not contradicted this assertion by
Lowell.

The Debtor has failed to offer the Court any reasonable alternative interpretation to the Rider. An examination of the Debtor's assertions and the alternative interpretations it advances leads to the conclusion that the Debtor is simply seeking a modification of the Lease. However, such an effort would be directly inconsistent with not only the clear and unambiguous language of the Rider but also with the parties' course of performance over a period of thirteen years.

Further, the Debtor seeks to establish the ambiguity of the Rider by reference to the Tax Refund Clause as essentially a latent ambiguity that arises out of the partition of the Real Property and the subsequent separate ownership of the Commercial Unit and Residential Unit. There is no question that the language of the Tax Refund Clause could not be literally enforced to provide a full refund, as what would appear to be the parties intent, of 33-1/3% of the taxes paid by the tenant if the Real Property is not owned by a single owner. The Tax Refund Clause provides that the landlord shall refund, less related expenses, 33/-1/3% of the refund *received* by the landlord (emphasis added). Since under separate ownership of the units the landlord would not necessarily be paying 33-1/3% of the taxes (this allocation could be either higher or lower depending on the tax obligation of the Commercial Unit) it would not necessarily receive as a refund an amount equal to 33-1/3%. However, it would arguably only be obligated to refund to the tenant that amount which it actually received. Therefore, the separate ownership results in a latent ambiguity regarding the Tax Refund Clause.

If it were confronted with the issue, a court would have to interpret the Tax Refund Clause in the context of the entire agreement, and as conceded by Lowell, the Tax Refund Clause would be interpreted to provide the tenant with the refund as if the

single owner owned the Real Property.  However, such latent ambiguity as to the Tax

Refund Clause does not result in the Tax Escalation Clause being ambiguous and

unenforceable.  The Tax Escalation Clause is clear and unambiguous in its terms,

including those addressing the partitioning of the Real Property and is not rendered

ambiguous by the latent ambiguity of another provision.

Additionally, the only issue before the Court is whether the Tax Escalation

Clause, as it the Court finds that in subparagraph 43(e), established a marker for future

rent increases that were based upon tax increases on the Real Property, regardless of the

ownership structure of the Real Property.  As stated above, any ambiguity found in the

Tax Refund Clause does not alter the Court's analysis for subparagraph 43(e), which

makes it clear that separate ownership of the units would not impact the tax allocation

under subparagraph 43(e).

**The Parties Course of Performance for Thirteen Years**

Where a lease clearly and unambiguously specifies that a tenant is responsible for

a certain fixed percentage of the tax escalations on a property, and the agreement was

negotiated at arms length, and where the parties course of performance showed that the

parties had abided by the agreement for a long period of time, courts will not void an

agreement that such parties clearly bargained.  *Meyers Parking System, Inc.*, 186 A.D.2d

at 92.

In *Meyers*, the department not only considered the clear and unambiguous

language of the lease, but also appeared to buttress its holding by considering the parties

long history of course of performance

> The language of the lease clearly and unambiguously specified that plaintiff was
> to pay 'a sum equal to 15%' of any real estate tax increase as additional rent.

26

> Such escalation clauses are common in commercial leases and have been
> approved and enforced according to their terms. There being no showing of
> unjust enrichment, unconscionability, mutual mistake or violation of public
> policy, the court properly granted summary judgment, noting that the lease had
> been negotiated at arms' length and abided by for over a period of 20 years. The
> parties intended that which they wrote.

*Meyers Parking System, Inc.*, 186 A.D.2d at 92.

To the extent any extrinsic evidence would be necessary to assist in the

interpretation of the Rider, the parties, including the debtor-in-possession, have already

provided the Court with a long history of a course of performance that fully supports the

Court's interpretation of the Rider.

"The parties to an agreement know best what they meant, and their action under it

is often the strongest evidence of their meaning." *Restatement (Second) of Contracts* §

202 (1981). In the interpretation of a contract, courts have often considered the meaning

of the contract by the ascription it was given, subsequent to its formation, by the actions

or acquiesce of the parties in the course of carrying out the agreement. At common law,

course of performance was generally known as practical construction. "Generally

speaking, the practical interpretation of a contract by the parties to it for any considerable

period of time before it comes to be the subject of controversy is deemed of great, if not

controlling, influence." *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118

(1913); see also *City of Chicago v. Sheldon*, 76 U.S. 50, 54 (1869); see also *District of

Columbia v. Gallaher*, 124 U.S. 505, 510 (1888); *Croce v. Kurnit*, 737 F.2d 229, 235 (2d

Cir. 1984); *In re Bennett Funding Group, Inc.*, 220 B.R. 743, 760 -761 (Bankr. N.D.N.Y.

1997). "Although not strictly such, this rule is sometimes treated as a branch of the law

of estoppel." *Old Colony Trust Co.*, 230 U.S. at 118.

The reliability found in the long established tradition between the parties is clear,

as noted by the Court in *Brooklyn Life Ins. Co. of New York v. Dutcher*, 95 U.S. 269

(1877). The Court held

> The practical interpretation of an agreement by a party to it is always a
> consideration of great weight. The construction of a contract is as much a part of
> it as any thing else. There is no surer way to find out what parties meant, than to
> see what they have done. Self-interest stimulates the mind to activity, and
> sharpens its perspicacity. Parties in such cases often claim more, but rarely less,
> than they are entitled to. The probabilities are largely in the direction of the
> former. In considering the question before us, it is difficult to resist the cogency
> of this uniform practice during the period mentioned, as a factor in the case.

*Brooklyn Life Ins. Co.*, 95 U.S. at 273.

In considering the parties' course of performance for thirteen years, from 1989-

2002, the tenant paid the rent increase based on the Tax Escalation Clause in paragraph

43, in accordance with the interpretation advanced by Lowell. The parties' course of

performance indicates that they never modified their understanding of the Rider.

Similarly, both parties for a period of thirteen years acted consistent with a single

interpretation of the Rider advanced by Lowell and found by the Court to be consistent

with the clear and unambiguous language of the Rider.

Additionally, in *CBS, Inc. v. P.A. Bldg. Co.*, 200 A.D.2d 527 (1st Dep't 1994), the

court dealt with a dispute over commercial rent charges based on an escalation clause in

the original lease agreement signed by the parities. The court found the commercial

lease at issue to be unambiguous. However, it also considered the parties' practical

construction of the escalation clause and noted that the tenant's long-term acquiescence

in landlord's interpretation of the escalation clause undermined its overcharging claim.

*CBS, Inc.*, 200 A.D.2d at 527.

The course of performance or the practical construction the parties have given the

Tax Escalation Clause found in the Rider to the Lease is clear.  From the time

immediately after the inception of the Lease and into 2002, the parties interpreted the

Lease in a way that provided for the payment of the tax increases despite the partition

and different ownership structure.  Indeed, for thirteen years, from 1989-2002, the tenant

paid the rent increase based on the Tax Escalation Clause in paragraph 43.  As stated

previously, the parties' course of performance only supports the Court's finding as to the

interpretation of the Lease.  Additionally, like the tenant in *CBS, Inc.*, the Debtor's long

acquiescence in Lowell's interpretation of the agreement undermines the Debtor's

current claim that it has been overcharged.  *CBS, Inc.*, 200 A.D.2d at 527.

**Successor in Interest**

The Court notes that since the inception of the Lease there have been two

successive tenants.  However, the Court does not find that assignment of the Lease alters

the Court's analysis of the parties' obligations under the Lease.

A party to a lease cannot receive any greater rights than those bestowed upon

them from its predecessor in interest.  "It is elementary ancient law that an assignee

never stands in any better position than his assignor.  He is subject to all the equities and

burdens which attach to the property assigned because he receives no more and can do

no more than his assignor." *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.,* 36

N.Y.2d 121,126 (1975) (internal citations omitted).  Similarly, "[a]n assignment does not

modify the terms of the underlying contract.  It is a separate agreement between the

assignor and assignee which merely transfers the assignor's contract rights, leaving them

in full force and effect as to the party charged.  Insofar as an assignment touches on the

obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor." *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983)(internal citations omitted).

Therefore, the rights and obligations that BSB had are the same as those of the Debtor.[15]

## Conversion to a Cooperative affected the Tax Rates

Finally, the Debtor alleges that the conversion of the Residential Unit to a CO-OP dramatically increased the overall real estate taxes due on the Real Property, thus imposing an unforeseen burden on it. However, conversion to a cooperative was contemplated and provided for under the Rider. Further, subparagraph 43(f) of the Rider provides for an adjustment to any tax increase under the Tax Escalation Clause resulting from the sale, ground lease, or alteration of the Real Property. Subparagraph 43(f) reads as follows

> Anything herein contained to the contrary notwithstanding, the tenant shall not be required to pay any tax escalations if the increase in assessment results solely from the sale, ground lease or substantial alteration of the building of which the demised premises forms a part, it being understood and agreed that the obligation of the tenant to pay its portion of tax escalations shall be limited to ordinary increases in assessment and the tax rate.

There is no evidence that any of the three triggering events under subparagraph 43(f) occurred. However, as a substantive matter, even if the circumstances surrounding the conversion of the property would constitute a triggering event under subparagraph 43(f), there is nothing in the record to establish that the assessment and tax rate would warrant

---

[15] The Court notes that, even though the result would be the same absent the following, Michael Hayes was a principal and owner in BSB, the predecessor in interest, and the Debtor, the successor in interest. At no time does the Debtor refute Lowell's assertion that Michael Hayes was active owner and principal in both BSB and the Debtor.

relief as a result of the conversion. No evidence has been presented to suggest that any increase in either the assessment or tax rate actually occurred, and any such increase was not "ordinary."[16]  Further, the Court finds that subparagraph 43(f), even if applicable to the conversion of the Residential Unit to a CO-OP, was waived by the Debtor's failure to act during the thirteen years following the conversion.

In conclusion, there is no evidence that the conversion of the Residential Unit to cooperative had an impact on the taxes of the Real Property that would warrant any relief under subparagraph 43(f).

## IV. CONCLUSION

Based upon the foregoing, the Court finds that the Tax Escalation Clause of the Rider to the Lease is clear and unambiguous and enforceable under New York state law. The fact that a single owner does not own the condominium units of the Real Property does not impact the enforceability of the Tax Escalation Clause.  In finding that Tax Escalation Clause is clear and unambiguous, the Court also finds that the Debtor has not offered any reasonable alternative interpretation to such clause.  Further, the Debtor has failed to establish that the enforcement of the Tax Escalation Clause would result in a

---

[16] The Court notes that throughout the life of the Lease, both the assessed values and the tax-rates attributable to the Commercial Unit and Residential Unit have fluctuated.  In the Base Tax Year, the Real Property was taxed as a Class 4 non-residential building at a rate of 9.582%.  Subsequent to the conversion, the Commercial Unit remained a Class 4 property, with a rate of 9.5389%, and the Residential Unit was taxed as a Class 2 property, at a rate of 9.229%.  In other words, the tax rates actually decreased immediately after the conversion to condominium ownership.  Furthermore, during the Base Tax Year, 1988-89, the assessed value of the Real Property was $4,200,000.  In the tax year 1989-1990, the total assessed value of the Real Property was the same as amount as it was in the Base Tax Year, with the Commercial Unit being assessed at $898,800 and the Residential Unit being assessed at $3,301,200, for a combined total of $4,200,000 for the 1989-90 tax year.

During the early 1990's, the rate of tax on the Commercial Unit was higher than the tax rate attributable the Residential Unit.  However, by the mid-1990's the Residential Unit began to be taxed at a higher rate than the Commercial Unit.  Currently, the Residential Unit is taxed at a higher rate, 12.396%, as compared to the Commercial Unit, at a rate of 11.306%.  See Docket #39: Affidavit of Robert M. Pollack, Esq.

finding of unjust enrichment, unconscionability, or in any way a violation of public policy because the parties formed the Lease after arms length negotiation.  Further, the Court finds that the Tax Escalation Clause was meant to be a "marker" upon which future rent obligations were to be calculated and not merely as a "pass through" form of a tax escalation clause that would have limited the rent increases under such clause to the actual tax burden of the landlord to that which would be associated to the Leased Space.

Additionally, the Court finds that the course of performance of the parties, including the Debtor's predecessor in interest, best illuminates the parties' intentions, despite the different owners of the Residential Unit and Commercial Unit.  The Court also finds that the failure of the landlord to provide an official copy of a tax bill on the Commercial Unit, combined with the tenant's acquiescence to that by its failure to make such a request, does not relieve the tenant in any way from the consequences of its overall course of performance regarding the Lease.  Further, the Court finds that the Debtor, as successor in interest, is bound by the course of performance of its predecessor in interest.  In addition, it has not been established that any relief would be warranted under that subparagraph 43(f), even if the tenant has not waived its rights under that subparagraph.

In conclusion, the Debtor is responsible for certain taxes increases based on the Tax Escalation Clause, and as further supported by the parties' interpretation of the Tax Escalation Clause as evidenced by their thirteen-year course of performance.  For the foregoing reasons, the Court grants Lowell's motion for the payment of all administrative expenses.

The parties are directed to submit a proposed order consistent with this opinion.

If the parties cannot agree on the actual of administrative expenses still due they are

directed to inform the Court and a further proceeding will be scheduled to resolve any

dispute.

Dated: New York, NY
      October 3, 2006

                           **s/Arthur J. Gonzalez**
                           UNITED STATES BANKRUPTCY JUDGE